IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| MATTHEW CLEMENT, #A0253074,<br><br>      Petitioner,<br><br>  vs.<br><br>JOSEPH TAYLOR,<br><br>      Respondent. | Civil No. 16-00351 JMS-KJM<br><br>FINDINGS AND RECOMMENDATION THAT MATTHEW CLEMENT'S 28 U.S.C. § 2254 PETITION BE DENIED |

## FINDINGS AND RECOMMENDATION THAT MATTHEW CLEMENT'S 28 U.S.C. § 2254 PETITION BE DENIED

On June 27, 2016, Matthew Clement ("Petitioner" or "Clement") petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). ECF No. 1. The Petition alleges that Clement's conviction in Hawaiʻi State Court violated his United States constitutional rights under: (1) the Fourth Amendment; (2) the Sixth Amendment Confrontation Clause; (3) the Sixth Amendment Assistance of Counsel Clause; and (4) the Fifth and Fourteenth Amendment Due Process Clauses. *See* ECF No. 1-1. The Petition also alleges that Clement's conviction violated his constitutional right to additional DNA testing. *Id.*

Respondent Joseph Taylor ("Respondent") filed his Answer to the Petition on August 25, 2016. ECF No. 11. Clement filed a "Traverse to Answer," that the Court construes as a reply, on September 15, 2016. ECF No. 12. After reviewing

and considering the Petition, Answer, Traverse to Answer, briefs, transcripts,

exhibits, and record, and being fully advised in this matter, the Court FINDS that

Clement's rights under the United States Constitution were not violated in the State

proceeding against him.  Accordingly, the Court RECOMMENDS that Clement's

Petition be DENIED for the reasons set forth below.

<u>BACKGROUND</u>

I.    Procedural Background

    A.    <u>Conviction, Sentence, and Direct Appeal</u>

On December 7, 1999, a jury in the Circuit Court of the First Circuit, State

of Hawai'i ("circuit court") found Clement guilty of the offenses of murder in the

second degree, burglary in the first degree, and place to keep firearm.  *See* Civil

No. 06-00351 DAE-BMK, *Clement v. Blair* ("*Blair*"), ECF No. 10-8 at 3.  On July

18, 2000, the circuit court sentenced Clement to imprisonment for life with the

possibility of parole for the murder conviction, 10 years of imprisonment for the

burglary conviction and place to keep firearm conviction, with a mandatory

minimum term of imprisonment of 15 years for use of a firearm in the commission

of a felony.  *Blair*, ECF No. 10-13 at 17-18.  All the terms of Clement's

imprisonment are to be served concurrently with each other.  *Id.*

On direct appeal to the Hawai'i Supreme Court, Clement raised five points

of error: (1) the circuit court "erred when it found that [Honolulu Police

Department Detective Anderson] Hee made no material omissions from his affidavit in support of the warrant to search [Clement's brother's] house and that the warrant was supported by probable cause"; (2) the circuit court "erred when it admitted Wimberly's hearsay statements"; (3) the circuit court "erred when it prevented Mr. Clement from adducing evidence that [Duane] Sato had been in possession of a firearm one month prior to the killing"; (4) the circuit court erred "when it conducted the Tachibana colloquy with Mr. Clement only after the defense had rested its case"; and (5) the circuit court "erred in its finding that trial counsel's specific errors or omissions reflecting trial counsel's lack of skill, judgment, or diligence, did not result in either the impairment or withdrawal of a potentially meritorious defense."[1]  *Blair*, ECF No. 10-10 at 2-3 ("Defendant Appellant's Amended Opening Brief on Direct Appeal").  On November 30, 2001, the Hawai'i Supreme Court affirmed Clement's conviction.  *Blair*, ECF No. 10-14 at 4 ("Hawai'i Supreme Court's Summary Disposition Order for Direct Appeal").

   B.  First Rule 40 Petition

On May 24, 2002, Clement filed a Petition to Vacate, Set Aside, or Correct Judgment Pursuant to Rule 40, Hawai'i Rules of Penal Procedure ("HRPP") ("First Rule 40 Petition"), alleging, as his sole ground for relief, ineffective assistance of trial counsel.  *Blair*, ECF No. 10-9 at 30-38.  After conducting an evidentiary

---

[1] It appears from the record that Clement's circuit court conviction was appealed directly to the Hawai'i Supreme Court.

hearing, the circuit court denied the First Rule 40 Petition on July 17, 2003. *Blair*, ECF No. 10-16 ("Order Denying Petition to Vacate, Set Aside, or Correct Judgment for First Rule 40 Petition"). On November 22, 2005, the Hawaiʻi Intermediate Court of Appeals ("ICA") affirmed the circuit court's denial of the First Rule 40 Petition. *Blair*, ECF No. 10-18 ("ICA's Summary Disposition Order for First Rule 40 Petition"). The Hawaiʻi Supreme Court denied Clement's application for writ of certiorari on December 30, 2005. ECF No. 11-4 ("Hawaiʻi Supreme Court's Order Denying Application for Writ of Certiorari for First Rule 40 Petition").

    C.  <u>First Federal Habeas Petition</u>

      On June 28, 2006, Clement filed a Petition for Writ of Habeas Corpus ("First Federal Habeas Petition") with this Court. *Clement v. Blair*, 2007 WL 57782, at *1 (D. Haw. Jan. 5, 2007), *report and recommendation adopted*, 2007 WL 1576465 (D. Haw. May 29, 2007). On January 4, 2007, the Court recommended that the First Federal Habeas Petition be dismissed without prejudice in order to allow Clement to exhaust his state remedies. *Id.* at *4. This Court filed its Order Adopting Magistrate's Order Dismissing Clement's First Federal Habeas Petition without prejudice on May 29, 2007. *Clement v. Blair*, 2007 WL 1576465 (D. Haw. May 29, 2007).

D.  Second Rule 40 Petition and Motion to Compel DNA Testing

On June 29, 2006, Clement filed a second Rule 40 Petition for Post-Conviction Relief to Vacate, Set Aside, or Correct Judgment or to Release Petitioner from Custody ("Second Rule 40 Petition").  ECF No. 11-5.  Clement's grounds for relief were: (1) ineffective assistance of trial counsel and ineffective assistance of prior Rule 40 counsel; (2) ineffective assistance of appellate counsel; and (3) failure to "conduct further DNA testing on the decedent's fingernail clippings, and compare the results to Duane Sato and to Matthew Clement."  *Id.* at 5-7.  On July 28, 2006, Clement filed a Motion to Compel DNA Testing of Remaining Fingernail Clippings from Eleanor Wimberly and to Compare and Compel DNA Samples from Matthew Clement and Duane Sato.  ECF No. 11-7 ("Motion to Compel DNA Testing").  On November 15, 2006, Clement filed a Supplemental Memorandum of Law in Support of his Motion to Compel DNA Testing.  ECF No. 11-8 ("Supplemental Memorandum of Law in Support of Petitioner's Motion to Compel DNA Testing").

On March 31, 2008, Clement filed an Amended Petition for Post-Conviction Relief to Vacate, Set Aside, or Correct Judgment or to Release Clement from Custody ("Amended Second Rule 40 Petition").  ECF No. 11-9.  In the Amended Second Rule 40 Petition, Clement's points of error were: (1) ineffective assistance of trial counsel and ineffective assistance of prior Rule 40 counsel; (2) circuit court

5

error in excluding defense evidence; (3) failure to "conduct further DNA testing on the decedent's fingernail clippings, and compare the results to Duane Sato and to Matthew Clement"; and (4) circuit court error in allowing into evidence hearsay statements of the deceased victim, Wimberly, in violation of Clement's Sixth Amendment constitutional right to confront his accuser. *Id.* at 5-6, 7, 9, 18, 20. On the same day, Clement filed his Amended Motion to Compel DNA Testing of Remaining Fingernail Clippings from Eleanor Wimberly and to Compare and Compel DNA Samples from Matthew Clement and Duane Sato ("Amended Motion to Compel DNA Testing"). ECF No. 11-11.

On April 14, 2011, the circuit court filed its Findings of Fact, Conclusions of Law and Order Denying Clement's Amended Motion to Compel DNA Testing ("Order Denying Motion to Compel DNA Testing"). ECF No. 11-12. On January 18, 2012, the circuit court filed its Findings of Fact, Conclusions of Law, and Order Denying Petition to Vacate, Set Aside, or Correct Judgment or to Release Clement from Custody ("Order Denying Second Rule 40 Petition"). ECF No. 11-13.

On appeal to the ICA, Clement's four points of error were: (1) the circuit court did not provide Clement with the opportunity to exhaust his state remedies with respect to federal claims for further DNA testing before proceeding with a federal habeas petition; (2) the circuit court refused to compel further testing of

DNA from remaining fingernail clippings of Wimberly; (3) the Hawaiʻi Paroling Authority should have held a new hearing to determine his minimum term consistent with recent Hawaiʻi case law; and (4) the circuit court erred because it allowed into evidence hearsay statements of the deceased victim, Wimberly, in violation of Clement's Sixth Amendment constitutional right to confront his accuser. ECF No. 11-14 at 23, 25, 28, 33 ("Petitioner-Appellant's Opening Brief on Second Rule 40 Petition"). On December 18, 2015, the ICA affirmed the circuit court's Order Denying Motion to Compel DNA Testing and Order Denying Second Rule 40 Petition ("ICA's Summary Disposition Order for Second Rule 40 Petition"). ECF No. 11-15. The ICA held that: (1) circuit court did not err in rejecting Clement's argument that a reasonable probability exists that Clement would not have been prosecuted or convicted if DNA analysis found Sato's DNA in the victim's fingernail clippings; (2) the circuit court did not deny Clement his due process rights by refusing to compel further DNA testing; (3) Clement's claims with respect to his minimum term were moot because the Hawaiʻi Paroling Authority had held a new minimum term hearing and reduced his minimum term and Clement did not claim that the new minimum term hearing was illegal; and (4) *Crawford v. Washington*, 541 U.S. 36 (2004) is not retroactively applicable on collateral review. *Id.* at 2-7. The Hawaiʻi Supreme Court denied Clement's application for writ of certiorari on June 13, 2016. ECF No. 11-16 ("Hawaiʻi

Supreme Court's Order Rejecting Application for Writ of Certiorari for Second
Rule 40 Petition").

    E.  Instant Federal Habeas Petition

On June 27, 2016, Clement filed the instant federal habeas petition.  ECF
No. 1.

II.    Factual Background

    A.  Events Before Wimberly's Death

At the time of her death, Wimberly was a resident of Pearl City,
Hawaiʻi.  *See Blair*, ECF No. 7-12 at 42.  During the two years prior to her death,
Wimberly's boyfriend, Duane Sato ("Sato"), primarily resided with Wimberly.  *Id.*
at 42-43, 46.  Sato also stayed at his parents' home in Pearl City on an occasional
basis.  *Id.* at 43.  Wimberly was acquainted with Clement.  *Id.*

At trial, Sato testified that around 7:30 p.m. on Monday, February 1, 1999,
he went to Wimberly's house.  *Id.* at 48.  Sato stated that when he arrived he
witnessed Wimberly smoking crystal methamphetamine ("crystal meth") with
Clement.  *Id.* at 46, 48-49.  Sato testified that Wimberly and Sato wanted to trade
some items with Clement in exchange for crystal meth.  *Id.* at 50-51.  He stated
that these items included "brand new slacks and shirts" that Wimberly had in a
blue suitcase.  *Id.* at 51-52.  Sato testified that he also wanted to trade some tools at
his father's house in exchange for drugs from Clement.  *Id.* at 51.  Sato stated that

after he retrieved the tools from his father's house, Clement refused to give him the crystal meth and Sato and Clement got into a loud argument. *See Blair*, ECF No. 7-13 at 1.

The next afternoon, on Tuesday, February 2, 1999, Sato testified that Clement arrived at Wimberly's house and gave Sato crystal meth residue scrapings from a pipe. *Id*. at 8-9. Sato stated that Clement said he would bring some more crystal meth later. *Id*. at 9. Sato testified that while Clement was present, Sato and Clement saw police officers drive past the house. *Id*. Upon seeing the police officers, Clement left through the backyard of Wimberly's house. *Id*. According to Sato, Wimberly's blue suitcase was still in Wimberly's house at this time. *Id*. at 12. That Tuesday night, Sato stated that he slept with Wimberly at her house. *Id*.

Sato testified that, after Clement left, Sato had the following conversation with Wimberly:

> [Wimberly] told me to -- well, when she escorted [Clement] out of the house, she told me to, you know watch out 'cause looks like he got a gun in his pocket.
> And I told her, "How you know that's one gun?"
> She said, oh, she could see, like, the handle, you know, bulging out of his pocket or something.
> …
> [She t]old me to watch out, this and that.
> And she would say something else, like, um, that, you know, she think that [Clement] wants to have sex with her and, you know, if he tries anything that she would tell [Clement] that, you know, she rather die than have sex with him.
> …
> And I told her, you know, "Shut up. No talk like that," you know.

And she said, um, if anything happens to her, that she going wait
'til I come back and -- and she going die. I told her, "Shut up. No
talk like that."

*Id*. at 12-13.

At trial, Honolulu Police Department ("HPD") Officer Daniel Gooch

("Officer Gooch") testified that he was patrolling the street in front of Wimberly's

house at approximately 8:10 a.m. on February 2, 1999. *See Blair*, ECF No. 9-2 at

60-61.  He testified that as he passed Wimberly's house, Officer Gooch saw

Clement jumping over Wimberly's back fence.  *Id*. at 61-62.  Officer Gooch

testified that he parked and knocked at the front door of the house.  *Id.* at 63.  He

stated that Wimberly did not open the front door but said from inside the house, "Is

he still out there?"  *Id*. at 67.  Officer Gooch testified that he knocked again and

Wimberly cracked open the door and asked, "Is Matthew still out

there?"  *Id*.  Officer Gooch testified that he asked, "Who?" and Wimberly repeated,

"Matthew, is he still out there?  He's tweaking.  He's going on."  *Id*.  Officer

Gooch testified at trial that Wimberly appeared scared and agitated as he spoke

with her.  *Id*. at 67-68.

Officer Gooch testified that at some time between 9:00 to 9:10 a.m. on

February 3, 1999, he passed Wimberly's house and saw Clement go between the

cars in the carport towards the back of the property.  *Id*. at 71.  Officer Gooch

testified that he then got out of his car and knocked on the door of Wimberly's

house but received no response.  *See Blair*, ECF No. 9-3 at 11-12.

    B.  <u>Evening of Wimberly's Death</u>

Sato testified that he left Wimberly's house at approximately 12:30 p.m. on

Wednesday, February 3, 1999.  *See Blair*, ECF No. 7-13 at 17-18.  He stated that

Wimberly was sleeping when he left.  *Id*. at 18.  Sato testified that he went to his

parents' house and slept for a couple of hours and then cooked some food to take

back to Wimberly.  *Id*. at 18-20.  Sato's father testified that Sato was at his house

from about 2:00 to 5:00 p.m.  *See Blair*, ECF No. 7-12 at 6-7.

Sato testified to the following:

1. He arrived at Wimberly's house at approximately 5:30 p.m. on
   Wednesday, February 3, 1999.  *See Blair*, ECF No. 7-13 at 20.  He
   knocked and called out to Wimberly for about fifteen to twenty
   minutes with no response.  *Id.* at 21.

2. He sat on the steps by the front door and waited about ten to fifteen
   minutes more.  *Id*. at 22.  He thought Wimberly might be at a friend's
   house taking a shower.  *Id*. at 23.  After waiting, he decided to go to a
   friend's house about two blocks away.  *Id*.  He came back to
   Wimberly's house about fifteen minutes later.  *Id*. at 26.

3. When he got back to Wimberly's house, he went to the front door and
   started knocking and yelling again.  *Id*.  When no one responded, Sato
   went to Wimberly's bedroom and broke in through the bedroom
   window.  *Id*. at 26, 28.

4. He went to the bathroom and found Wimberly face down in a
   kneeling position in the bathtub.  *Id*. at 28, 29.  He grabbed Wimberly
   and laid her down on her back in the bathtub and tried to give her
   mouth-to-mouth resuscitation and CPR.  *Id*. at 29-30.  When he did

not get any results, Sato laid Wimberly back into the tub and ran for help. *Id*. at 30-31.

5. A neighbor told Sato he would call 911 and Sato ran back into the house to Wimberly and waited for the ambulance and the police to arrive. *Id*. at 33.

City and County of Honolulu ("City") Paramedic Randall Tanaka ("Tanaka") testified that he received a call at 7:09 p.m. on February 3, 1999 to go to Wimberly's house. *See Blair*, ECF No. 8-8 at 35, 48. Tanaka stated that he arrived at 7:15 p.m. *Id.* at 48. Tanaka testified that when he arrived at Wimberly's residence, he heard a male voice from inside the house asking in a pleading, almost crying voice for help for someone inside. *Id*. at 37-38. Tanaka stated that when the paramedics entered they found Wimberly's body in the bathtub and that there were no vital signs of life. *Id*. at 39. Tanaka testified that the paramedics gave Wimberly CPR and transported her to the Kapiolani Pali Momi Hospital in an ambulance. *Id*. at 40-41. Wimberly was pronounced dead at the hospital. *Id.* at 42.

Kanthi Von Guenthner ("Guenthner"), First Deputy Medical Examiner for the City, testified that Wimberly had two gunshots to her head, two gunshots to her face, and one gunshot to her left chest. *See Blair*, ECF No. 8-7 at 48-49. Guenthner stated that the cause of death was from multiple gunshot wounds which caused injury to Wimberly's brain and lungs. *Id*. at 63. Guenthner testified that toxicology tests indicated that Wimberly's blood contained methamphetamine

12

and amphetamine.  *See Blair*, ECF No. 8-8 at 6.  The medical examiner testified that she could not determine the time of death.  *Id*. at 13-14.  As part of her routine procedures, Guenthner took Wimberly's fingernail clippings and turned them over to the police.  *Id.* at 18.

A teenage neighbor, who lived in the house next door to Wimberly's house, testified that he heard "about seven gunshots" around 4:35 p.m. to 4:45 p.m. on February 3, 1999.  *Blair*, ECF No. 9-2 at 64, 67.  The neighbor testified that he heard two shots, a two second pause, and then five shots.  *Id.* at 65.

Sato testified that he had Wimberly's blood all over his face, arms, hands, and clothes when the ambulance and the police arrived.  *See Blair*, ECF No. 7-13 at 37.  Sato testified that he believed that initially the police suspected that he had killed Wimberly.  *Id*. at 38.  Sato told the police that he suspected that Clement had killed Wimberly and showed them where Clement resided.  *Id*. at 38.  The police placed Sato in custody on the night of February 3, 1999.  *Id*. at 41-42.  Sato took and failed a polygraph test on the night of his arrest.  *See* ECF No. 11-3 at 13.  A few days after the first polygraph was administered, Sato took another polygraph test and passed.  *See Blair*, ECF No. 7-13 at 41.

The morning after Sato's arrest, he made a statement to the police.  *Id*. at 42.  Sato denied killing Wimberly.  *Id.* at 42.

C.  Debra Rutkowski's Testimony

Debra Rutkowski ("Rutkowski") lived next door to Wimberly for about ten years prior to Wimberly's death.  *See Blair*, ECF No. 9-9 at 44-45.  Rutkowski testified that:

1. When she came home from a club around 4:00 a.m. in the morning on February 3, 1999, she heard Wimberly "screaming" at Sato, "f*in get out of this house," and that Sato replied, "You know, every time you find somebody else with the drug, you throw me out.  And then when, you know, there's -- when they're gone and the drugs gone, then you bring me back."  *Id*. at 52.

2. Rutowski heard Sato and Wimberly continue "screaming and arguing" until she left her house at 5:15 a.m. to drop her son off.  *Id*. at 52-53.  When she returned home at approximately 5:45 a.m. to 6:00 a.m., she could hear that Sato and Wimberly were still arguing.  *Id*. at 54.

3. In order to drown out the noise from Wimberly and Sato fighting, so that she could go to sleep, Rutkowski turned on all of the air conditioners on the side of her house which faced Wimberly's house.  *Id.*

4. Later on that day, between 3:00 p.m. and 3:30 p.m., she woke up and was sitting in her kitchen when she heard Wimberly yelling, "Get the f* out of here.  Just leave me alone and get the f* out of here.  Why -- Why you always have to do this to me?"  *Id*. at 54-55.  Rutkowski turned the television volume up to drown out the noise and did not hear anything after that.  *Id.* at 56-57.

D.  Steven Gileece's Testimony

Steven Gileece ("Gileece") testified that he was an acquaintance of Clement.  *See Blair*, ECF No. 8-13 at 2, 4, 5.  He stated that in February 1999 he was living under a bridge.  Gileece testified that:

14

1. Clement came by his living area to see him on Tuesday night, February 2, 1999. *Id.* at 5-6, 7, 10. During the visit, Clement fired off a gun into the stream. *Id.* at 7. Gileece did not recognize the type of firearm that Clement was holding. *Id.* at 7. Clement told Gileece that he was firing at fish. *Id.* at 8.

2. Gileece believed that Clement was "tweaking", *i.e.*, babbling and acting very strange as a result of lack of sleep and from smoking crystal meth. *Id.* at 8-9, 10-11.

3. The next day, on Wednesday, February 3, around 11:00 a.m. or noon, Clement came to where Gileece was staying and again fired a gun into the stream. *Id.* at 12, 16. This time, Gileece recognized the firearm as a .22 caliber "snub-nose type" revolver, silver colored, with a brown handle. *Id.* at 12-13. Clement pointed the revolver in Gileece's direction at some point and Gileece believed that there were bullets in each chamber. *Id.* at 13. Clement was still talking "gibberish" and Gileece believed that Clement was "very high." *Id.* at 14.

4. Clement asked Gileece if he needed a place to live and mentioned that he might be getting a place. *Id.* at 15. Clement said that there was "a girl", but that there was a Japanese guy that was living there that he "had to get rid of first." *Id.* at 15-16.

5. At about 2:00 a.m. or 3:00 a.m. the next morning on Thursday, February 4, Clement appeared again at Gileece's place under the bridge. *See Blair*, ECF No. 9-2 at 3. Clement was wearing a dark sweatshirt with the hood up, dark sweatpants, gloves, and dark sunglasses. *Id.*

E.  Search and Arrest Warrant

On February 5, 1999, HPD Officers Dennis Dupont ("Du Pont") and Daniel Aoki ("Aoki") were assigned to locate Clement. *See Blair*, ECF No. 9-3 at 25, 42. At trial, Aoki testified as follows: (1) Dupont and Aoki went to Clement's father house first but did not find Clement there; (2) the officers then proceeded to

Clement's brother's house; (3) when they arrived at the house, they saw Clement

working on a bicycle in front of the garage; (4) while the officers were parking

their car, Aoki saw Clement run into the house through the front door; (5) as Aoki

approached the side of the house, he saw Clement in the back of the house "about

to jump the fence"; (6) Aoki called out "police" and Clement ran back into the

house; (7) the officers knocked on the door and called for Clement to come out of

the house, but he refused; (8) the next day, Aoki applied for a warrant to search

Clement's brother's house and an arrest warrant for Clement based on two

outstanding bench warrants. *Id.* at 25-27, 29-31, 33, 44, 45.

   According to the affidavit submitted in support of the warrant to search

Clement's brother's home: (1) Sato advised HPD Detective Anderson Hee ("Hee")

that Wimberly "had a dispute with Clement, that Clement had been at the victim's

home the past few days and had been smoking crystal methamphetamine with both

Sato and Wimberly, that the dispute was over payment for use of the crystal

methamphetamine," that the day prior to Wimberly's death, Wimberly told Sato

that she saw the butt of a handgun in Clement's pocket; (2) Hee supervised the

processing of the crime scene and "located a .22 caliber lead projectile in the

bathtub where the victim's body was found"; (3) it was Hee's "opinion through

training and experience that the handgun that [Clement] had been seen with at the

victim's home may be within the premises . . . that along with said handgun there

16

should be .22 caliber ammunition"; (4) on February 5, 1999, Du Pont and Aoki

observed Clement at his brother's home and that said "residence was surrounded

and the Specialized Services Division was called to assist in negotiating Clement

out of the residence." ECF No. 11-21 at 9-11 ("Hee Affidavit in Support of Search

Warrant").

Erika Kaneaiakala Liashenko ("Liashenko"), a HPD evidence specialist,

testified that during a subsequent search of Clement's brother's house, the police

recovered a black backpack containing a .22 caliber Pathfinder, Charter Arms

revolver. *See Blair*, ECF Nos. 9-5 at 61, 69; 9-6 at 6. Liashenko stated that the

HPD also recovered a sock containing a box of .22 caliber ammunition and a blue

suitcase without a handle. *See Blair*, ECF No. 9-6 at 2-3, 21-22.

### F. Testimony Regarding Evidence: Firearm, Ammunition, and Wimberly's fingernail clippings

At trial, the circuit court determined that witness Charles Davis ("Davis")

was an expert in the area of firearm examination. *See Blair*, ECF Nos. 8-11 at 6.

Davis testified that he examined the .22 caliber revolver found at Clement's

brother's house and three lead bullets recovered from the scene of Wimberly's

shooting. *See Blair*, ECF Nos. 8-10 at 70; 8-11 at 10, 14-16. Davis testified that:

> 1. The fact that no cartridge casings were found at the scene of the shooting would tend to indicate that a revolver was the murder weapon because a revolver does not eject the cartridge casings. *See Blair*, ECF No. 8-11 at 27-28.

2. The number of land and groove impressions on the bullets was consistent with the number of lands and grooves on the .22 caliber revolver found at Clement's brother's house. *Id.* at 29.

3. The bullets could have been fired from the revolver found at Clement's brother's house. *Id.* at 30-31.

The trial court determined that witness Stephanie Kamakana ("Kamakana"), was an expert in fingerprint identification. *See Blair*, ECF No. 8-12 at 9-10. Kamakana testified that she had positively identified Clement's fingerprint on the barrel of the .22 caliber revolver found at Clement's brother's house. *Id*. at 29-31. Kamakana also testified that she had positively identified Clement's fingerprint on a videotape that was recovered from Wimberly's bedroom. *Id*. at 32-33.

HPD criminalist Wayne Kimoto ("Kimoto") testified that he tested scrapings from under Wimberly's fingernails to determine whether DNA was present and, if so, to determine the origin of that genetic material. *See Blair*, ECF No. 7-11 at 13-14. He stated that he determined that the scrapings contained two types of DNA material; one which came from Wimberly and another which may have come from Wimberly, a third person, or resulted from a technical artifact. *Id.* at 14-16. Kimoto testified that a technical artifact could be a result of the procedure used to analyze the sample, an unusual subtype of the individual whose DNA is consistent with that found in the sample, or contamination. *Id.* at 16-17. However, Kimoto concluded that the test result did not reach a level that would have permitted him to include or

exclude another individual as the source of the material. *Id.* at 17-19. Kimoto

testified that, because he only used a portion of the fingernail clippings recovered

from Wimberly, it might be possible to test the remaining clippings to determine if

there was enough additional DNA to include or exclude possible suspects. *Id.* at 17-

22.

G. Testimony Regarding Clement's Whereabouts the Night of Wimberly's Death

Clement called his brother's ex-girlfriend, Corinne Perry ("Perry"), to testify

at trial. *Blair*, ECF No. 8-5 at 40. Perry testified that Clement's brother had told

Clement to come over to his house and stay with Perry because Clement did not

have a place to stay at that time. *Id.* at 41-42. Perry stated that Clement showed up

at their house between 8:20 a.m. and 8:30 a.m. the morning of February 3,

1999. *Id.* at 41. Perry testified that Clement was with her the entire day, except for

a 20 to 25 minute time period when she went to her babysitter's house. *Id.* at 42-

43. She stated that she left the house at approximately 5:20 p.m. to 5:30 p.m. and

returned home at approximately 5:45 p.m. *Id.* at 42-43, 46-47. Perry testified that

when she left the house Clement was by the back kitchen door talking on the

phone. *Id.* at 47. She stated that when she returned home at approximately 5:45

p.m., Clement was sitting on the front stairs of the house with a telephone. *Id.*

Clement's aunt, Sharn West ("West") testified she had a telephone

conversation with Clement on February 3, 1999. *See Blair*, ECF No. 9-11 at

60.  She stated that Clement called her at 5:15 p.m. from his brother's house and that she spoke with Clement for 10 to 15 minutes.  *Id*. at 62-63, 64, 65.  She testified that she called Clement back at his house around 5:30 or 5:35 p.m. and spoke with him for 10 minutes.  *Id*. at 66.

<u>DISCUSSION</u>

I.    Standard of Review

This Court has jurisdiction to rule on Clement's petition for habeas corpus relief.  *See* 28 U.S.C. § 2241(a).

Federal habeas corpus relief must be based on a violation of the United States Constitution or laws or treaties of the United States.  *See* 28 U.S.C. § 2254.  The criteria for obtaining habeas corpus relief is set forth in 28 U.S.C. § 2254 which provides in pertinent part:

**(a)**    The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

**(b)**

**(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

**(A)** the applicant has exhausted the remedies available in the courts of the State;

\*      \*      \*

20

> **(2)** An application for a writ of habeas corpus may be denied on
> the merits, notwithstanding the failure of the applicant to
> exhaust the remedies available in the courts of the State.
>
> \*        \*        \*
>
> **(d)** An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim—
>
> > **(1)** resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law,
> > as determined by the Supreme Court of the United States; or
> >
> > **(2)** resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented
> > in the State court proceeding.
>
> **(e)**
>
> > **(1)** In a proceeding instituted by an application for a writ of
> > habeas corpus by a person in custody pursuant to the
> > judgment of a State court, a determination of a factual issue
> > made by a State court shall be presumed to be correct. The
> > applicant shall have the burden of rebutting the presumption
> > of correctness by clear and convincing evidence.

The right to habeas relief was significantly curtailed by the passage of the

Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Williams*

*v. Taylor,* 529 U.S. 362, 382 (2000).  Prior to the AEDPA, a federal court

entertaining a state prisoner's application for habeas relief was required to exercise

its independent judgment when deciding both questions of constitutional law and

mixed constitutional questions (*i.e.*, application of constitutional law to fact).

*See*, *e.g., Miller* v. *Fenton,* 474 U. S. 104, 112 (1985).  Post-AEDPA, the federal

courts must defer to state court action unless such action violates or unreasonably

applies precedent established by the United States Supreme Court ("Supreme

Court") or if the state court's decision was based on an unreasonable determination

of the facts in light of the evidence.  28 U.S.C. § 2254(d).  Thus, the scope of this

Court's powers with regard to Clement's petition are narrow and limited.  This

Court may grant habeas relief only if the state court proceedings violated or

unreasonably applied clearly established law as determined by the Supreme Court

or resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §

2254(d).

The Supreme Court has provided detailed guidelines for the scope of the

federal courts' review of petitions for habeas corpus.  *See Williams v. Taylor,* 529

U.S. 362, 389-390 (2000).  A state court's decision is contrary to clearly

established federal law if it is based on facts that are materially indistinguishable

from those upon which a decision of the Supreme Court is based and nevertheless

arrived at a different result or it applies a rule that contradicts Supreme Court

precedent.  *See Price v. Vincent,* 538 U.S. 634, 640 (2003); *see also Early* v.

*Packer,* 537 U. S. 3, 7-8 (2002) (*per curiam*).  To determine whether state court

action is unreasonable the federal court must ask whether the application of

federally establish law is objectively unreasonable.  *See Price*, 538 U.S. at 640.  An

"unreasonable" application of federal law is different from an incorrect application of federal law. *See Williams*, 529 U.S. at 410. Thus, even if the state court misapplied federal law, its ruling must be an unreasonable interpretation or application of the law in order to merit habeas relief.

In further defining the term "unreasonable," the Supreme Court has concluded that "state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." *Id.* at 389. It is the petitioner's burden of establishing that the state court applied the prevailing Supreme Court precedent to the facts of his case in an objectively unreasonable manner." *Price*, 538 U.S. at 641 (internal citation omitted).

Pursuant to the habeas statute, this Court is required to presume that the Hawai'i Supreme Court and the ICA's factual determinations are correct. *See* 28 U.S.C. § 2254(e)(1) (providing that this presumption may be rebutted by clear and convincing evidence). Based upon the Hawai'i Supreme Court and the ICA's findings of fact, and for the reasons set forth below, the Court finds that neither the Hawai'i Supreme Court nor the ICA's adjudication of Clement's claims was contrary to, or involved an unreasonable application of, clearly established federal law.

II.    Exhaustion of State Remedies

Prior to bringing a petition for habeas corpus relief, a petitioner must exhaust all of his state remedies as outlined in 28 U.S.C. § 2254(b)(1)(A).  A petitioner shall not be deemed to have exhausted his state court remedies if he has "the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).

With respect to the issues raised in the Petition, the Court finds that Clement has exhausted his state remedies.

On April 11, 2011, Clement appealed the circuit court's verdict of his conviction to the Hawai'i Supreme Court and asserted *inter alia* that: (1) the circuit court "erred when it found that Hee made no material omissions from his affidavit in support of the warrant to search [Clement's brother's] house and that the warrant was supported by probable cause" ("search warrant claim") and (2) the circuit court "erred when it admitted Wimberly's hearsay statements [to Officer Gooch and Sato]" ("hearsay claim").  *Blair*, ECF No. 10-10 at 17-18.  On November 30, 2011, the Hawai'i Supreme Court denied Clement's appeal and held that the affidavit made in support of the search warrant established probable cause and that the circuit court properly admitted Wimberly's hearsay statements to Officer Gooch and Sato.  *See Blair*, ECF No. 10-14.  Clement has therefore completely

and adequately exhausted his state remedies with respect to his search warrant and hearsay claims.

On May 24, 2002, Clement filed a Rule 40 Petition in the circuit court alleging as his sole ground for relief, ineffective assistance of trial counsel ("IAC"). *Blair*, ECF No. 10-9. The circuit court denied Clement's Rule 40 Petition on July 17, 2003 and held that "there is no actual evidence of specific errors or omissions in the conduct of [Clement's trial counsel] that resulted in the withdrawal or the substantial impairment of a meritorious defense for Mr. Clement." *Blair*, ECF No. 10-16. On November 22, 2005, the ICA affirmed the circuit court's ruling. *Blair,* ECF No. 10-18. The Hawaiʻi Supreme Court denied Clement's application for writ for certiorari on December 30, 2005. *See* ECF No. 11-4.

On June 29, 2006, Clement filed his Second Rule 40 Petition to the circuit court and asserted, among other things, ineffective assistance of trial counsel. *See* ECF Nos. 11-5; 11-9. On November 15, 2006, Clement submitted a supplemental memo in support of his Motion to Compel DNA Testing. *See* ECF No. 11-7. The circuit court denied Clement's Motion to Compel DNA Testing on April 14, 2011. *See* ECF No. 11-12. On January 18, 2012, the circuit court denied Clement's Second Rule 40 Petition. *See* ECF No 11-13. Clement appealed the circuit court's decision denying his Second Rule 40 Petition and his Motion to

Compel DNA testing to the ICA on March 4, 2013. *See* ECF No 11-14. The ICA

affirmed the circuit court's ruling regarding Clement's Motion to Compel DNA

Testing and Second Rule 40 Petition on December 18, 2015. *See* ECF No 11-

15. On June 13, 2016, the Hawaiʻi Supreme Court denied Clement's application

for writ of certiorari regarding these two matters. *See* ECF No 11-16. Clement has

therefore completely and adequately exhausted his state remedies with respect to

his DNA Testing and IAC claims. *See Bowen v. Roe*, 188 F.3d 1157, 1160 (9th

Cir. 1999) (finding that the California Supreme Court denial of a petitioner's

application for direct review constituted exhaustion of state remedies).

III.    Discussion

    A.  <u>The Affidavit in Support of the Search Warrant of Clement's Brother's
        Residence Established Probable Cause</u>

    Clement claims that the circuit court violated his Fourth Amendment rights.

ECF No. 1 at 1. The Fourth Amendment to the United States Constitution

provides:

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the place
> to be searched, and the persons or things to be seized.

    Clement claims that the warrant that was issued to search his brother's

residence was based on the circuit court's unreasonable application of established

federal law. ECF No. 1 at 1-4. The basis for Clement's argument is twofold. *Id.*

First, Clement argues that the search warrant was not supported by a showing of probable cause. *Id*. Second, he argues that there were "material omissions" in the affidavit presented in support of the request for the warrant. *Id*. Defendant argues that Clement "fails to cite any United States Supreme Court precedent that would compel the exclusion of evidence obtained with a valid search warrant simply because the affidavit supporting the search warrant did not contain additional information concerning alternative suspects other than the suspect who is the subject of the search warrant." ECF No. 11-1 at 23-24.

The Hawaiʻi Supreme Court addressed and rejected Clement's Fourth Amendment claims in his direct appeal of the circuit court's rulings. *See Blair*, ECF No. 10-14.

The probable cause standard for issuance of a search warrant is whether, based on common sense considerations, there is "a fair probability that contraband or evidence of a crime [would] be found in a particular place." *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). If the issuing court determines that it would be reasonable to seek the evidence in the place indicated in the affidavit, the issuance of a search warrant is proper. *See United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991).

The circuit court relied upon the statements Sato made to the HPD, in part, when it issued the warrant to search Clement's brother's home. In 1983, the

27

Supreme Court reversed its long-established standard for the issuance of search

warrants based on informant statements and held that a state court must examine

the totality of the circumstances to determine whether a search warrant should

issue. *See Gates,* 462 U.S. at 214 (reversing *Spinelli v. United States*, 393 U.S. 410

(1969) and *Aguilar v. Texas,* 378 U.S. 108 (1964)).  Prior to *Gates*, the Supreme

Court had held that the state courts must apply a two-pronged test to determine

when an informant's tip furnishes probable cause to issue a search warrant.  Under

the test, a police officer applying for a warrant had to present the magistrate with a

factual showing of both the informant's basis of knowledge and either the

credibility of the informant or the reliability of his information.  *See Aguilar, 3*78

U.S. at 114; *Spinelli,* 393 U.S. at 413.  This test allowed law enforcement to obtain

warrants based on informant tips, but also sought to protect Fourth Amendment

interests by requiring that only reliable, trustworthy tips be used.  *Id*.  In *Gates*,

though, the court held that the two-prong test was too rigid and that a probable

cause inquiry based on a totality of the circumstances should apply.  *See Gates*,

462 U.S. at 214.  One of those circumstances may include the trustworthiness of

the information relief upon by law enforcement.  *Id*.

An informant's veracity, reliability, and knowledge of the underlying facts

are all highly relevant to the issue of probable cause, but the overriding question is

whether common sense, based on an analysis of the totality of the facts and

circumstances, provides probable cause to believe that contraband or evidence is located in a particular place. *See Gates,* 462 U.S. at 231. Probable cause is a fluid concept and, as the *Gates* court noted: "as the very name implies, [] deal[s] with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gates,* 462 U.S. at 231 (quoting *Brinegar v. United States,* 338 U.S. 160, 175 (1949)). An affidavit which contains hearsay may be utilized to establish probable cause for issuance of a warrant. *Id.* at 242.

This Court finds that there was more than adequate probable cause to issue the search warrant in this case. While the affidavit in support of the search warrant relied in part upon Sato's statements, the affidavit was detailed and had indicia of reliability. The affidavit set forth the following factual bases supporting probable cause: (1) Sato advised Hee that Clement had smoked crystal meth with Wimberly and Sato at Wimberly's residence, that Wimberly had fought with Clement, that the dispute was over payment for the crystal meth, and that the day prior to Wimberly's death, Wimberly told Sato that she saw the butt of a handgun in Clement's pocket; (2) Hee had located a ".22 caliber lead projectile in the bathtub where the victim's body was found"; (3) Hee believed that the handgun that [Clement] had been seen with at the victim's home may be at the residence at issue in the search warrant . . ." along with .22 caliber ammunition; and (4) two days

after Wimberly's death two HPD officers observed Clement at his brother's home

and Specialized Services Division was called to assist in negotiating Clement out

of the residence. ECF No. 11-21 at 9-11. The facts presented in the affidavit

provided ample probable cause that a search of Clement's brother's home was

warranted. Therefore, this Court finds that the issuance on the warrant complies

with the probable cause standard set forth in *Illinois v. Gates.*

The second basis for Clement's claim of a Fourth Amendment violation is

his allegation that the affidavit in support of the issuance of the warrant was flawed

because it omitted potentially relevant facts. *See* ECF No. 1 at 1-4.

The circuit court held a four-day hearing on Clement's claim that the

purported omissions deprived him of his Fourth Amendment rights. *See* ECF Nos.

11-3; 11-17; 11-18; and *Blair*, ECF No. 7-6. The circuit court concluded that

Clement "failed to make any substantial preliminary showing that the affidavit

contained material misstatements, false information, or had material

omissions." ECF No. 11-23. Specifically, the circuit court held that, "[a]lthough

the second search warrant did not contain information regarding Duane Sato or the

statement of Deborah Rutkowski [that Sato and Wimberly fought the night before

her death], such statements were not material omissions requiring invalidation of

the warrant." ECF Nos. 11-23 at 5; 11-3 at 31. The Hawai'i Supreme Court

upheld the circuit court's determination that the omissions did not negate the finding of probable cause. *See Blair*, ECF No. 10-14 at 3.

Clement alleges that the law enforcement officials investigating Wimberly's murder procured the search warrant through deception. *See* ECF No. 1-1 at 2. To prevail on this claim, Clement has the burden of showing that the affiant deliberately or recklessly made false statements or omissions that were material to the court's finding of probable cause. *See Franks v. Delaware*, 438 U.S. 154, 171-2 (1978); *Ewing v. City of Stockton,* 588 F.3d 1218, 1223 (9th Cir. 2009). Even if the allegation has merit, if the challenged material is removed from consideration and there remains sufficient content in the affidavit to support a finding of probable cause, no evidentiary hearing is required. *See Franks*, 438 U.S. 171-2. "[I]f the remaining content is insufficient, however, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his [evidentiary] hearing." *Id.*

If a party makes a substantial showing of deception and thus mandates an evidentiary hearing, the court must then determine the materiality of the allegedly false statements or omissions. *See Ewing*, 588 F.3d at 1224. In the event that an officer submits false statements in support of the issuance of a warrant, "the court purges those statements and determines whether what is left justifies issuance of the warrant." *Id.* at 1224. Where an officer omits facts "required to prevent technically true statements in the affidavit from being misleading, the court must

decide whether the subsequently corrected and supplemented affidavit is sufficient to establish probable cause." *Id.* If probable cause still exists after amendment, then the "State magistrate or court has not violated the accused's Fourth Amendment rights." *Bravo v. City of Santa Maria,* 665 F.3d 1076, 1084 (9th Cir. 2011).

The Court is mindful that "[b]y reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw," and that "[t]o allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning." *United States v. Stanert,* 762 F.2d 775, 781 (9th Cir. 1985), *amended by* 769 F.2d 1410 (9th Cir. 1985).

With respect to the exclusion of potentially exculpatory information in a search warrant, the Ninth Circuit has repeatedly emphasized that the Fourth Amendment does not require inclusion of all exculpatory evidence, and has upheld a warrant in the face of omitted evidence that contradicted statements in the warrant application. *See Beltran v. Santa Clara County,* 389 Fed.Appx. 679, 681 (9th Cir. 2010); *Ewing*, 588 F.3d at 1226-27 (concluding that, given the strength of the identification by one witness, omission of a non-identification by another witness "does not cast doubt on probable cause."); *see also U.S. v. Cokley*, 899 F.2d 297, 302 (4th Cir. 1990) (noting that "non-lawyers who normally secure warrants in the heat of a criminal investigation should not be burdened with the

same duty to assess and disclose information as a prosecutor who possesses a mature knowledge of the case.").

The Second Circuit has also held that "a reviewing court must accord considerable deference to the probable cause determination of the issuing court, mindful of the well-established principle that a showing of probable cause cannot be negated simply by demonstrating that an inference of innocence might also have been drawn from the facts alleged." *United States v. Webb*, 623 F.2d 758, 761 (2d Cir. 1980); *see United States v. Forero-Rincon*, 626 F.2d 218, 222 (2d Cir. 1980).

As discussed above, if a state court finds that an affidavit included false statements, the proper procedure is for the court to purge those statements and determine whether the remaining statements justify issuance of the warrant. *See Ewing*, 588 F.3d. at 1224. If a court finds that an affidavit excludes material facts, "the court determines whether the affidavit, once corrected and supplemented, establishes probable cause." *Id.* "If probable cause remains after amendment, then no constitutional error has occurred." *Id.*

Clement does not claim that that the affidavit contains false statements. Rather, Clement argues that the affidavit contains omissions including the fact that Sato, the source of the information, "had argued with Wimberly and Clement earlier in the day of the murder, was jealous of Clement because Wimberly ignored him in favor of someone who had drugs, was arrested at the murder scene

covered with blood, and failed a polygraph test thereafter." ECF No. 1-1 at

2. Clement also claims that the affidavit is flawed because it does not include

Rutkowski's statements that she overheard Sato and Wimberly argue the night

before Wimberly's death. *Id.*

      Because the Ninth Circuit does not require the inclusion of all potentially

exculpatory evidence, this Court can review the statements contained in the

affidavit without correction or supplementation. As discussed above, the

statements and information provided in the affidavit establish that the issuing court

had a substantial basis for its probable cause determination.

      Even if the omissions were material and the affidavit required correction and

supplementation, the Court still finds that probable cause remains after the

statements are included. Although the inclusion of the purported omissions may

have cast some doubt regarding Sato's credibility as the source of the information

in the affidavit, the statements do not negate the potential truthfulness of the

statements that established probable cause to search Clement's brother's

residence. Indeed, Clement does not dispute the truthfulness of the statements in

the affidavit. Instead, he only argues that additional statements regarding another

potential suspect should have been included in the affidavit. The fact that there

may be more than one potential suspect does not negate the issuance of a search

warrant as to a suspect identified by the police. In the matter here, based on the

statements set forth in the affidavit, the circuit court could reasonably conclude that there would be a fair probability that the evidence in question would be found where Clement was residing. *See Olvera v. Cty. of Sacramento*, 932 F. Supp. 2d 1123, 1154 (E.D. Cal. 2013) (noting that because enough evidence corroborated significant portions of a witness's statements, the omission of potentially conflicting evidence in the form of other witnesses' impressions of what they saw would not have precluded a finding of probable cause).

Finally, and most importantly for purposes of this Court's review pursuant to the habeas statute, Clement fails to cite any Supreme Court precedent that would compel the exclusion of evidence obtained with a valid search warrant simply because the affidavit supporting the search warrant did not contain additional information concerning alternative suspects other than the suspect who is the subject of the search warrant.

Based on the totality of the evidence adduced at the trial, it was not an unreasonable determination of the facts for the Hawai'i Supreme Court to implicitly find that any omissions, either individually or collectively, from the affidavit supporting the application for the search warrant were not made in bad faith and were not material to whether there was probable cause to support a search and that there was probable cause to support the search. *See Simmons v. Poe*, 47

35

F.3d 1370, 1384 (4th Cir. 1995) (omission of fact that victim had initially believed her attacker to be white not intentional or made in reckless disregard of the truth).

The Hawaiʻi Supreme Court's affirmation of the circuit court's ruling that Clement "failed to demonstrate any basis for his allegation that Hee intentionally omitted information that would cast doubt on the existence of probable cause," is in accordance with precedent established by the Supreme Court.  The Court therefore FINDS that the circuit court properly applied established law of the Supreme Court with regard to the validity of the search warrant issued in this case and that its application of such law was reasonable.  The Court further FINDS that the circuit court's actions did not violate Clement's rights under the Fourth Amendment.

    B.   <u>The Admission of Wimberly's Hearsay Statements through Officer Gooch and Sato Was Not Contrary to, Nor Did it Involve, an Unreasonable Application of Clearly Established Federal Law</u>

In support of his Petition, Clement claims that the circuit court violated his rights under the Confrontation Clause of the Sixth Amendment when it allowed into evidence Wimberly's out-of-court hearsay statements "because the evidence neither fell within a firmly-rooted exception to the hearsay rule nor possessed particularized guarantees of trustworthiness."  ECF No. 1-1 at 4.  At trial, the circuit court allowed Officer Gooch and Sato to testify as to Wimberly's statements to them.  *See Blair*, ECF Nos. 7-13 at 12-13; 9-2 at 61-63, 67, 68.

The Hawaiʻi Supreme Court held that the circuit court did not err when it admitted Wimberly's hearsay statements through the testimony of Sato and Officer Gooch. *See Blair*, ECF No. 10-14 at 3. In the ICA's Summary Disposition Order for Second Rule 40 Petition, the ICA concluded that *Crawford v. Washington*, 541 U.S. 36 (2004), does not to apply to Clement's case because his conviction was final on direct appeal before *Crawford* was decided. *See Blair*, ECF No. at 11-15 at 7.

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The Sixth Amendment is part of the Bill of Rights. The Supreme Court has held that "a provision of the Bill of Rights which is 'fundamental and essential to a fair trial' is made obligatory upon the States by the Fourteenth Amendment." *Gideon v. Waingwright,* 372 U.S. 335, 342 (1963) (right to counsel).

In 1965, the Supreme Court held that the Confrontation Clause is a fundamental right and therefore applies to state court proceedings under the Fourteenth Amendment. *See Pointer v. Texas,* 380 U.S. 400, 405 (1965). In *Pointer*, the Supreme Court noted:

> There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-

examination is an essential and fundamental requirement for the
kind of fair trial which is this country's constitutional goal.

*Pointer*, 380 U.S. at 405. The purpose of the Confrontation Clause is to ensure that

"convictions will not be based on the charges of unseen and unknown -- and hence

unchallengeable -- individuals." *Lee v. Illinois,* 476 U.S. 530, 540 (1986).

A literal reading of the Clause's term "witnesses" would preclude all hearsay

testimony in criminal prosecutions. The state and federal courts, however, have

recognized exceptions permitting the use of hearsay testimony in certain

circumstances. When the prosecution seeks to offer a hearsay statement, the court

must decide whether the statement is so reliable that the prosecution may safely

"deny the accused his usual right to force the declarant to submit to cross-

examination . . . ." *Lilly v. Virginia,* 527 U.S. 116, 124 (1999) (internal citation

omitted) (quoting *California v. Green,* 399 U.S. 149, 158 (1970)).

Under the framework summarized in *Ohio v. Roberts,* the controlling law at

the time of Clement's conviction, admission of an out-of-court statement at trial

does not violate the Confrontation Clause if the statement possesses "adequate

indicia of reliability." 448 U.S. 56, 65–66 (1980), *abrogated by Crawford v.*

*Washington,* 541 U.S. 36 (2004). A statement is sufficiently reliable if it falls

"within a firmly rooted hearsay exception" or bears "particularized guarantees of

trustworthiness." *Id.* at 66. The "'particularized guarantees of trustworthiness'

required for admission [of hearsay statements] under the Confrontation Clause

must . . . be drawn from the totality of circumstances that surround the making of

the statement and that render the declarant particularly worthy of belief." *Idaho v.*

*Wright,* 497 U.S. 805, 820 (1990).

Even if a petitioner establishes that hearsay testimony does not fall within a

firmly-rooted exception or bear particularized guarantees of trustworthiness, the

criteria for obtaining habeas relief are not necessarily met. *See Brecht v.*

*Abrahamson,* 507 U.S. 619, 638 (1993). In order to prevail on a habeas petition, a

petitioner must not only show a constitutional violation, but must also establish

that the violation caused actual prejudice. *Id*. A constitutional violation caused

actual prejudice if "the violation had a 'substantial and injurious effect or influence

on the jury's verdict.'" *Id*. at 623.

### 1. Wimberly's Statements to Officer Gooch

Clement claims that his constitutional rights were violated when the circuit

court allowed into evidence Wimberly's hearsay statements to Officer

Gooch. ECF No. 1 at 8. Officer Gooch testified that after seeing Clement jump

over the back fence of Wimberly's home, he knocked on Wimberly's door. *See*

*Blair*, ECF No. 7-9 at 60, 62. Officer Gooch stated that Wimberly responded from

inside, "Is he still out there?" *Id*. at 66. Officer Gooch knocked again and

Wimberly cracked open the door and asked, "Is Matthew still out

there?" *Id*. Officer Gooch asked, "Who?" and Wimberly repeated, "Matthew, is

he still out there?  He's tweaking.  He's going on." *Id*.  Officer Gooch testified at

trial that Wimberly appeared scared and agitated as he spoke with her.  *Id*. at 67.

In his Answer, Defendant asserts that Wimberly's statements to Officer

Gooch were properly admitted pursuant to Hawaiʻi Rules of Evidence (HRE) Rule

804(b)(5) (1993), the Hawaiʻi state law "recent perception" exception to the

hearsay rule.  *See* ECF No. 11-1 at 30.  The Hawaiʻi Supreme Court, however, held

that the hearsay statements to Officer Gooch were properly admitted because

"Wimberly's hearsay statements did not unfairly prejudice Clement," not pursuant

to HRE 804(b)(5) as Defendant asserts.  *Blair*, ECF No. 10-14 at 3.

For the reasons set forth below, the Court agrees with the Hawaiʻi Supreme

Court's ruling and finds that the hearsay statements were properly admitted

because Wimberly's statements to Officer Gooch did not unfairly prejudice

Clement.

HRE Rule 804(b)(5) is the statement of recent perception hearsay exception

and provides that:

> A statement, not in response to the instigation of a person engaged in
> investigating, litigating, or settling a claim, which narrates, describes,
> or explains an event or condition recently perceived by the declarant,
> made in good faith, not in contemplation of pending or anticipated
> litigation in which the declarant was interested, and while the
> declarant's recollection was clear.

Neither the Supreme Court nor this Court has ruled as to whether the

statement of recent perception exception is a "firmly-rooted" exception to the rule

against hearsay.  HRE 804(b)(5) is a hearsay exception pursuant to the Hawaiʻi

Rules of Evidence.  As of this date, the Federal Rules of Evidence do not contain

this exception.[2]

The Court need not reach the question of whether the recent perception

exception applies in this matter, or speculate at how the Supreme Court would

view this exception, because the Court finds that Clement fails to show actual

prejudice as the result of any error.  *See Brecht*, 507 U.S. at 623.

First, there was additional and substantial evidence to support the conviction

even without Officer Gooch's testimony as to Wimberly's statement.  It was not

unreasonable to conclude that the jury found this additional evidence to be

compelling.  Second, both Gileece and Sato testified to facts which could

reasonably have caused Wimberly to fear Clement.  Third, the overall strength of

the prosecution's case supported the conviction.  The non-hearsay evidence against

Clement included the following: a .22 caliber lead projectile was found at the

---

[2] In 2016, the Advisory Committee of the Rules of Evidence issued a report of proposed changes to the Federal Rules of Evidence.  http://www.uscourts.gov/ sites/default/files/2016-10-evidence-agenda-book.pdf.  One of the proposed changes was to add a hearsay exception for recent perceptions.  *Id*. at 7.  The exception would apply primarily to allow broader admissibility for evidence electronic communications such as tweets or texts.  *Id.*  The Committee decided to defer action on the amendment and directed the Committee's Reporter to monitor developments in the case law on admissibility of social media communications. *Id*.  Thus, the Advisory Committee acknowledged that a recent perception exception may be appropriate and did not reject the exception out of hand.

crime scene; the police confiscated a .22 caliber handgun, .22 caliber ammunition, and the victim's suitcase from the house where Clement was residing; Gileece, Clement's acquaintance, testified that Clement was babbling and acting irrationally the night before Wimberly's death and was using a handgun to shoot bullets into a nearby stream; and, Sato, the victim's boyfriend, testified that Clement and Wimberly had a dispute regarding payment for crystal meth the night before her death.  There is ample support for the jury's verdict based solely on the non-hearsay evidence.  Therefore, the admission of the hearsay did not have a substantial and injurious effect or influence upon jury's verdict.  *Brecht*, 507 U.S. at 637.

Clement fails to show actual prejudice as a result of the circuit court's admission of the statements.  Therefore, Clement is not entitled to relief with respect to Wimberly's statements to Officer Gooch because the admission was not contrary to, nor did it involve, an unreasonable application of Supreme Court precedent.

### 2.  Wimberly's Statements to Sato

Clement also claims that the circuit court violated his Sixth Amendment rights when it allowed Wimberly's hearsay statements to Sato into evidence because the "evidence neither fell within a firmly-rooted exception to the hearsay rule nor possessed particularized guarantees of trustworthiness."  ECF No. 1 at 8.

42

At trial, Sato testified that the night before Wimberly's death, Wimberly told him that: (1) she thinks Clement wants "to have sex with her"; (2) she saw the butt of a handgun hanging out of Clement's pocket; (3) he should be careful because Clement was carrying a gun; and (4) "if anything happens to her, that she going wait 'till [Sato] come[s] back and . . . she going die." *Blair*, ECF No. 7-13 at 12-13.  Defendant asserts that the Hawai'i Supreme Court properly found that Wimberly's statements to Sato were correctly admitted pursuant to HRE Rule 804(b)(5) (1993).  *See* ECF No. 11-1 at 30.

The Court again need not reach the issue of whether HRE 804(b)(5) is a "firmly-rooted" exception to the rule against use of hearsay in criminal prosecutions because the evidence apart from Wimberly's hearsay statements to Sato was a sufficient basis to reasonably conclude Clement had not been impermissibly prejudiced.  Wimberly's statements to Sato that -- she was afraid of Clement and that Clement possessed a gun -- was cumulative of other physical evidence and corroborated by the testimony of a number of other witnesses.  There was a long list of compelling evidence that supported Clement's conviction even without Sato's testimony that Wimberly was afraid of Clement and that Clement possessed a gun.  Second, Wimberly's statements to Sato were generally cumulative of other evidence.  Both Larry Rutkowski and Officer Gooch's testimony supported Wimberly's statements to Sato that she was afraid of

Clement.  Third, the physical evidence corroborated Wimberly's alleged

statements.  The police recovered a revolver and ammunition where Clement was

residing and Gileece's testimony that Clement was shooting a firearm in a nearby

stream corroborated Wimberly's statements that Clement possessed a gun.  While

Clement urges the Court to find that Sato's testimony lacked credibility, credibility

is an issue for the jury, not a Court hearing a habeas petition.  Clement's argument

ignores the corroborating physical evidence of his guilt.

Thus, the Hawai'i Supreme Court did not unreasonably hold that

Wimberly's hearsay statements to Sato were admissible because any they did not

have a "substantial and injurious effect or influence on the jury's verdict." *Brecht*,

507 U.S. at 623.  Clement is thus not entitled to relief with respect to the

admissions of Wimberly's hearsay statements to Sato.

### 3.  Inapplicability of *Crawford v. Washington*

The ICA concluded that the Supreme Court's holding in *Crawford v.*

*Washington* did not apply to Clement's case because his conviction was final on

direct appeal before *Crawford* was decided.  The Court finds that ICA's holding is

not contrary to, nor does it involve an unreasonable application of, clearly

established federal law.  *See* ECF No. 11-15 at 7; *Crawford v. Washington*, 541

U.S. 36 (2004) (holding that out-of-court statements by witnesses that are

testimonial are barred under the Confrontation Clause unless witnesses are

44

unavailable and defendants had prior opportunity to cross-examine witnesses,

regardless of whether such statements are deemed reliable by the court, abrogating

*Ohio v. Roberts*, 448 U.S. 56 (1980)).

The Court agrees with the ICA's conclusion that *Crawford* is not applicable to

Clement's case because the Supreme Court has held that *Crawford* is not

retroactively applicable to collaterally attack a conviction.  *See Whorton v. Bockting*,

549 U.S. 406, 421 (2007) (holding that: (1) "because *Crawford* announced a new

rule and because it is clear and undisputed that the rule is procedural and not

substantive, that rule cannot be applied in [a] collateral attack on respondent's

conviction unless it is a watershed rul[e] of criminal procedure implicating the

fundamental fairness and accuracy of [a] criminal proceeding" and (2) the new rule

in *Crawford* was not a "watershed rule").

Even if *Crawford* was applicable, which it is not, it would not create a bar to

the admissions of Wimberly's statements to Sato and Officer Gooch because they

were not made in anticipation of litigation and thus were not testimonial.  Statements

are non-testimonial when made in the course of police interrogation under

circumstances objectively indicating that the primary purpose of the interrogation is

to enable police assistance to meet an on-going emergency.  They are testimonial

when the circumstances objectively indicate that there is no such on-going

emergency, and that the primary purpose of the interrogation is to establish or prove

past events potentially relevant to later criminal prosecution. *See Michigan v. Bryant*, 562 U.S. 344, 377-78 (2011) (holding that when circumstances of the encounter act as statements and actions of declarant and police objectively indicate that "primary purpose of the interrogation" was "to enable police assistance to meet an ongoing emergency," the declarant's statements are not testimonial hearsay); *Davis v. Washington*, 547 U.S. 813, 822 (2006).

Here, Officer Gooch spoke with Wimberly when he was faced with a possible emergency, *i.e.*, Wimberly's stated fear that Clement was "tweaking" and was still in the vicinity of Wimberly's home. *See Blair*, ECF No. 9-2 at 67-68. Because Officer Gooch was dealing with a possible emergency, Wimberly's statements to him were not testimonial, and therefore *Crawford* would not apply even if the case was retroactively applicable.

The Court therefore FINDS that the Hawai'i Supreme Court's holding that the circuit court did not err when it admitted Wimberly's hearsay statements, was not contrary to, nor did it involve, an unreasonable application of clearly established federal law. The Court further FINDS that the circuit court's actions did not violate Clement's rights under the Confrontation Clause of the Sixth Amendment.

C.  <u>The ICA's Conclusion that Clement Failed to Make a Showing that His
Trial Counsel Was Ineffective Was Not Contrary to, Nor Did it Involve,
an Unreasonable Application of Clearly Established Federal Law</u>

Clement claims that the circuit court violated his Sixth Amendment right to

assistance of counsel because his trial counsel, Hayden Aluli ("Aluli"), was

ineffective.  *See* ECF Nos. 1 at 9; 1-1 at 27.  Clement also claims that the circuit

court violated his constitutional rights when it "failed to provide Clement with a

full hearing on his ineffective assistance of counsel claims by not requiring Aluli's

testimony at said hearing."  ECF No. 1-1 at 19.  Defendant asserts that the ICA's

findings that: (1) the circuit court "did not abuse its discretion in not continuing the

evidentiary hearing to allow [Clement's collateral review counsel] to subpoena

Clement's trial attorney" and (2) the circuit court "did not err in finding that 'there

[wa]s no actual evidence of specific errors or omissions in the conduct o[f] [trial

counsel] that resulted in the withdrawal or substantial impairment of a meritorious

defense for Mr. Clement'" were not contrary to, nor did they involve, an

unreasonable application of Supreme Court precedent.  The Court agrees with

Defendant.

The Sixth Amendment right to assistance of counsel accords criminal

defendants a right to reasonably effective legal counsel given the totality of the

circumstances.  *See Strickland v. Washington*, 466 U.S. 668, 680 (1984).  The

Supreme Court's decision in *Strickland*, constitutes "clearly established federal

law" providing the proper framework for assessing Clement's IAC claims.  Under

the AEDPA, the primary issue is whether the state court adjudication of a claim

was objectively reasonable.  *See Schriro v. Landrigan,* 550 U.S. 465, 473

(2007).  To prevail on an IAC claim under *Strickland,* a petitioner must show (1)

"that counsel's performance was deficient," and (2) "that the deficient performance

prejudiced the defense."  *Strickland,* 466 U.S. at 687.  In evaluating IAC claims, a

court must "use a 'doubly deferential' standard of review that gives both the state

court and the defense attorney the benefit of the doubt."  *Burt v. Titlow,* 134 S.Ct.

10, 13 (2013).

As to the first prong of the *Strickland* test, a petitioner must prove that

counsel's performance was so deficient that it "fell below an objective standard of

reasonableness."  *Strickland*, 466 U.S. at 688.  The Supreme Court has instructed

lower courts to "indulge a strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance . . . ."  *Id.* at 689.  As to the

second prong, a petitioner "must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceedings would have

been different."  *Id.* at 694.  Finally, even if a petitioner can satisfy both of those

prongs, the AEDPA provides that a federal court must find the state court's denial

of an IAC claim is objectively unreasonable before granting habeas relief.  *See*

*Woods v. Sinclair*, 764 F.3d 1109, 1131–32 (9th Cir. 2014); *Landrigan,* 550 U.S. at 473.

    1. Clement's Ineffective Assistance of Counsel Claim

  Clement claims that he was denied the effective assistance of counsel.  ECF No. 1-1 at 15.  The ICA affirmed the circuit court's finding that there was "no actual evidence of specific errors or omissions in the conduct of trial counsel that resulted in the withdrawal or substantial impairment of a meritorious defense for Mr. Clement."  *Blair*, ECF No. 10-18 at 7.  The Court agrees with the ICA's determination and finds that Clement's IAC claim is without merit.

  In the Petition, Clement states that "this was a close case," that the only evidence offered against him was circumstantial, and "[p]owerful evidence pointed to [] Sato, Eleanor's jealous, dysfunctional, and drug addicted boyfriend, who fought with her on the day she died, discovered her body, was found by police covered with her blood, and had the motive and the opportunity to kill [Wimberly]."  *Id.* at 1-1 at 17.  Clement further states that if not for "Aluli's incompetence, the jury: (1) would have learned from multiple witnesses that Sato had a .22 handgun similar to the murder weapon; (2) would not have viewed

evidence recovered by a warrantless search; and (3) would not have heard Larry

Rutkowski's opinion about the relationship between Clement and Wimberly."[3]  *Id.*

The Court finds that the alleged errors cited above were not the result of

Aluli's incompetence.  First, Clement does not dispute that Aluli raised the defense

that Sato killed Wimberly.  *See* ECF No. 1-1 at 13.  The jury was presented with

testimony that Wimberly fought with Sato the night before her death; that Sato

discovered the victim's body; and that Sato was covered in blood when the

paramedics and HPD were called to the scene of the murder.  It is reasonable that

the jury, as the trier of fact, considered and rejected Clement's theory of the

case.  Second, Larry Rutkowski's testimony was not the only evidence presented to

the jury regarding Clement and Wimberly's relationship.  Sato testified that

Wimberly was afraid of Clement (*see Blair*, ECF No.  7-13 at 12-13) and Officer

Gooch testified that Wimberly appeared scared that Clement was tweaking and still

outside of her home the night before her death (*see Blair*, ECF No. 9-2 at 60-

70).  Finally, despite Clement's assertion that the search of his brother's residence

was "warrantless," the Hawaiʻi Supreme Court and this Court have found that the

Hee affidavit submitted in support of the search warrant established probable cause

and that the search warrant was properly issued.

---

[3] Larry Rutkowski lived next door to Wimberly and testified that he frequently heard
Wimberly and Clement fighting.  *See Blair*, ECF No. 10-2 at 23-25.

Based on the above, the Court finds that: (1) Clement has not met his burden to prove that Aluli's performance was so deficient that it fell below an objective standard of reasonableness; and (2) Clement has not shown that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

 2. The Circuit Court's Denial of a Continuance for a Hearing on Clement's Ineffective Assistance of Counsel Claim

Upon the filing of Clement's First HRPP Rule 40 Petition, the circuit court held an evidentiary hearing on Clement's IAC claim. *See Blair*, ECF No. 10-18 at 4. Clement did not testify at the evidentiary hearing, and Clement's collateral review counsel represented to the circuit court that he had not subpoenaed Clement's trial counsel to appear at the hearing. *See Blair*, ECF No. 10-15 at 2-3, 5. Clement's collateral review counsel asked the circuit court for a continuance to attempt to subpoena Clement's trial counsel to appear at the hearing but the circuit court declined to grant a continuance. *See Blair*, ECF No. 10-18 at 4.

The ICA concluded that the circuit court "did not abuse its discretion in not continuing the evidentiary hearing to allow [Clement's collateral review counsel] to subpoena Clement's trial attorney when [Clement's collateral review counsel] had made no attempt to subpoena Clement's trial attorney prior to the hearing." *Blair*, ECF No. 10-18 at 6. The Court agrees with the ICA's determination.

To warrant habeas relief, a petitioner must show actual prejudice to his or her defense resulting from the trial court's refusal to grant a continuance.  *See Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997).  Clement has not demonstrated actual prejudice resulting from the circuit court's denial of his motion to continue the IAC hearing to allow for Clement to subpoena Aluli.  In his Petition, Clement sets forth the basis for his conclusion that his conviction was the result of Aluli's incompetence.  Clement's accusations of Aluli's incompetence, however, are not supported by the record.  The Court disagrees with Clement that even if a continuance had been granted, the ICA's determination would have been different.  *See* ECF No. 1-1 at 17.  As discussed above, the alleged errors and omissions as described by Clement were not the result of Aluli's incompetence.  As Clement acknowledges, the jury was presented with evidence and testimony that Sato was a potential suspect, and a number of reviewing courts, including this one, found that there was probable cause in the affidavit submitted in support of the warrant to search Clement's brother's residence.  The jury could have based its verdict on the physical evidence presented against Clement.

Clement has made no showing that he suffered actual prejudice as a result of the circuit court's refusal to grant a continuance.  Therefore, the circuit court's ruling is in accordance with established federal law and was proper.

The Court therefore FINDS that the ICA's holdings that: (1) Clement failed to make a showing that his trial counsel was ineffective and (2) the circuit court did not abuse its discretion in not continuing the IAC hearing, were not contrary to, nor did they involve, an unreasonable application of clearly established federal law. The Court further FINDS that the circuit court's actions did not violate Clement's Sixth Amendment right to assistance of counsel.

    D.   <u>The ICA's Conclusion that the Denial of Clement's Motion to Compel Additional DNA Testing Did Not Violate Clement's Due Process Rights Was Not Contrary to, Nor Did it Involve, an Unreasonable Application of Clearly Established Federal Law</u>

Clement claims that the circuit court's denial of his motion to compel additional DNA testing deprived Clement "of his liberty interest in utilizing State procedures to obtain reversal of his conviction and/or to obtain a pardon or reduction of his sentence." ECF No. 1 at 18. The ICA held, *inter alia*, that: (1) the circuit court did not err in finding that Clement had made no showing that "a reasonable probability exists that Clement would not have been prosecuted or convicted if DNA analysis found Sato's DNA in the victim's fingernail clippings" and (2) the circuit court did not deny Clement his due process rights by refusing to compel further DNA testing. ECF No. 11-15 at 5. The Court finds that the ICA's determinations are not contrary to, nor did they involve, an unreasonable application of clearly established federal law.

53

The Supreme Court has held that a defendant does not have a constitutional right to post-conviction access to DNA evidence.  *See Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 72 (2009); *Turner v. Dumanis*, 415 F. App'x 831, 832 (9th Cir. 2011).  In *Osborne*, the Supreme Court observed that the task of regulating modern DNA testing "belongs primarily to the legislature."  *Osborne,* 557 U.S. at 62.  The question for this Court is whether consideration of Clement's claim within the framework of Hawaiʻi's procedures for post-conviction relief "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgresses any recognized principle of fundamental fairness in operation."  *Medina v. California,* 505 U.S. 437, 446, 448 (1992) (internal quotation marks omitted); *see Herrera v. Collins*, 506 U.S. 390, 407–408 (1993) (applying *Medina* to post-conviction relief for actual innocence); *Pennsylvania v. Finley*, 481 U.S. 551, 556 (1987) (post-conviction relief procedures are constitutional if they "compor[t] with fundamental fairness").  Federal courts may upset a state's post-conviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights of a defendant.  *See Osborne*, 557 U.S. at 69.

Thus, the Court must first determine whether Hawaiʻi's procedures for post-conviction access to DNA testing are "fundamentally inadequate to vindicate the

substantive rights provided," then, if adequate, consider whether the circuit court properly applied that procedure in Clement's case.

The Court notes that Hawaiʻi Revised Statutes ("HRS") sections 844D–121–133 (2007) establish procedures for post-conviction DNA testing. These provisions permit a defendant "who was convicted of and sentenced for a crime" to move for DNA analysis of evidence and require the court to order DNA testing if certain conditions are met. Haw. Rev. Stat. §§ 844D–121 and 123; *see State v. Pavich*, 119 Haw. 74, 86, 193 P.3d 1274, 1286 (Haw. Ct. App. 2008), *as corrected* (Oct. 10, 2008).

HRS section 844D-123(a)(1) provides for mandatory DNA testing if "[a] reasonable probability exists that the defendant would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis." HRS section 844D-123(b)(1) provides for discretionary DNA testing if "[a] reasonable probability exists that DNA analysis of the evidence will produce results that would have led to a more favorable verdict or sentence for the defendant had the results been available at the proceeding leading to the verdict or sentence." HRS sections 844D-123(a)(4) and (b)(3) also require that, "[t]he evidence was not previously subjected to DNA analysis or was not subjected to analysis that can now resolve an issue not resolved by previous analysis."

The Court sees nothing inadequate about the post-conviction procedures Hawaiʻi has provided to those who seek access to DNA evidence. Hawaiʻi provides for mandatory DNA testing if the court finds that the motion for testing is made for the purpose of demonstrating innocence. *See* HRS § 844D-123(5). It exempts such motions from otherwise applicable time limits. *See* HRS § 844D-121. These procedures are not without limits. The evidence must not have been previously subjected to DNA analysis to qualify under Hawaiʻi's statute, must have been diligently pursued, and must also be sufficiently material. These procedures are similar to those provided for DNA evidence by federal law, *see*, *e.g.*, 18 U.S.C. § 3600(a), and they are not inconsistent with the "traditions and conscience of our people" or with "any recognized principle of fundamental fairness." *Medina*, 505 U.S. at 446, 448 (internal quotation marks omitted); *Osborne*, 557 U.S. at 69–70.

Contrary to Clement's contentions, the circuit court did not err in rejecting his argument that a reasonable probability exists that he would not have been prosecuted or convicted if DNA analysis found Sato's DNA in the victim's fingernail clippings. *See* ECF No. 11-15 at 5. As the circuit court observed, in light of the fact that Sato was the victim's boyfriend at the time of her murder, there were various, non-criminal explanations for why Sato's DNA may be present under the victim's fingernails. One explanation is the fact that Sato and Wimberly

lived together most of the time and were involved in a romantic relationship.  In

addition, at trial, Clement vigorously pursued the defense that Sato, not Clement,

shot Wimberly.  Clement fails to acknowledge the circuit court's references to the

compelling evidence that he was the perpetrator of this crime including, *inter alia*:

Wimberly's statement to Sato that she saw Clement with a gun and that he should

be careful; Wimberly's statement to a police officer that Clement "keeps coming

around"; that Clement was seen outside of the victim's residence on the day that

she was killed; that Clement was seen by his friend with a .22 caliber revolver;

that, upon execution of a search warrant, the victim's suitcase, a .22 caliber

revolver and ammunition were discovered at the home of Clement's brother; and,

that ballistic evidence supported Clement's conviction.  The Court concludes that

the ICA properly determined that the circuit court did not err in its application of

the HRS section 844D–123 standard to deny Clement's request for DNA testing.

       1.  *Skinner v. Switzer*

In Petitioner's Second Rule 40 Petition, the ICA rejected Clement's

argument that *Skinner v. Switzer*, 562 U.S. 521 (2011) "holds that a due process

violation occurs where the state court, in applying a state statute, requires a

showing that the prisoner would not have been convicted if exculpatory results had

been obtained through DNA testing or that the evidence was not previously tested

through no fault of his own."  ECF No. 11-15 at 5.  The Court agrees with the

ICA's rejection of Clement's interpretation of *Skinner.*

      *Skinner* does not stand for the proposition that a defendant's due process

rights are violated if a state court requires the defendant to show that he or she

would not have been convicted if exculpatory results had been obtained through

DNA testing.  Rather, *Skinner* answered the limited question of whether a

convicted state prisoner seeking DNA testing of crime-scene evidence must assert

that claim in a civil rights action under 42 U.S.C. § 1983 ("Section 1983"), or if

such a claim is cognizable in federal court only when asserted in a petition for a

writ of habeas corpus under 28 U.S.C. § 2254.  *See Skinner*, 562 U.S. at

524.  *Skinner* held that a defendant could present such claims in a Section 1983

action.  *Id*. at 534.  The Supreme Court specifically did not address Skinner's

substantive claim and remanded for determination of those questions.  *Id.* at 537.

      The Court therefore FINDS that the ICA's holding that: (1) the circuit court

did not err in finding that Clement had made no showing that "a reasonable

probability exists that Clement would not have been prosecuted or convicted if

DNA analysis found Sato's DNA in the victim's fingernail clippings" and (2) the

circuit court did not deny Clement his due process rights by refusing to compel

further DNA testing, was in accordance with Supreme Court precedent.  ECF No.

11-15.

E.  <u>Due Process</u>

Throughout his Petition, Clement appears to generally allege that the circuit

court violated his due process rights under the Fifth and Fourteenth Amendment.

*See* ECF No. 1-1.

The due process clause of the Fifth Amendment provides: "No person shall

be deprived of life, liberty, or property, without due process of law."  The Fifth

Amendment protects citizens from federal action.  The due process clause of the

Fourteenth Amendment provides: "No state shall make or enforce any law which

shall abridge the privileges or immunities of citizens of the United States; nor shall

any state deprive any person of life, liberty, or property, without due process of

law."  The purpose of the due process clause in the Fourteenth Amendment is to

afford citizens the right to due process in state proceedings.

The lengthy recitation of the procedural history in this matter evidences that

Clement received procedural due process.  All of his claims were heard before the

state trial and appellate courts.  His matter was also heard by the Hawai'i Supreme

Court.  Clement availed himself of relief in the federal courts by filing two

petitions for habeas corpus.  The first petition was denied without prejudice

because Clement had not yet exhausted all of his available state remedies.  The

second petition is the subject of the matter here.  This Court has found that

Clement had availed himself of all of his state remedies.  This Court has also

conducted a vigorous review of the record at all stages of the state and federal proceedings.  As is set forth at length, this Court has found that the state trial and appellate court's determinations were not contrary to, nor did they involve, an unreasonable application of clearly established federal law.  Thus, Clement has received both procedural and substantive due process.

The Court therefore FINDS that the state trial and appellate courts did not violate Clement's due process rights under the Fifth and Fourteenth Amendments.

<u>CONCLUSION</u>

For the foregoing reasons, the Court FINDS that Clement's conviction did not violate his constitutional rights under: (1) the Fourth Amendment; (2) the Sixth Amendment Confrontation Clause; (3) the Sixth Amendment Assistance of Counsel Clause; and (4) the Fifth and Fourteenth Amendment Due Process Clauses.  The Court further FINDS that the circuit court's refusal to compel DNA testing was not contrary to, nor did it involve, an unreasonable application of clearly established federal law.  The Court therefore RECOMMENDS that Clement's Petition be DENIED.

IT IS SO FOUND AND RECOMMENDED.

DATED: Honolulu, Hawai'i, March 2, 2017.



/S/ Kenneth J. Mansfield
Kenneth J. Mansfield
United States Magistrate Judge

*Clement v. Taylor*, CV 16-00351 JMS-KJM; Findings and Recommendation that Matthew Clement's 28 U.S.C. § 2254 Petition be Denied.

61